UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BYRON MIGUEL MENDEZ TZOC,<br><br>                              Petitioner,<br><br>v.<br><br>Christopher LaROSE, Warden, Otay Mesa Detention Center; Markwayne MULLIN, Secretary, U.S. Department of Homeland Security; David J. VENTURELLA, Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; Todd BLANCHE, Acting Attorney General of the United States, U.S. Department of Justice,<br><br>                              Respondents. | Case No.:  26-cv-3965-GPC-VET<br><br>**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[Dkt. No. 1.]** |

On July 10, 2026, Byron Miguel Mendez Tzoc ("Petitioner") filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging the legality of his immigration detention and seeking release or, in the alternative, a constitutionally adequate custody hearing.  (Dkt. No. 1.)  Respondents filed a response on July 16, 2026.  (Dkt. No. 4.) Petitioner filed a traverse on July 17, 2026.  (Dkt. No. 5.)  In response to the Court's order,

Petitioner filed supplemental documents that have been filed under seal.  (Dkt. Nos. 6, 11.)  For the reasons set forth below, the Court GRANTS the petition for writ of habeas corpus.

## Background

Petitioner is a native and citizen of Guatemala.  (Dkt. No. 1, Pet. ¶ 20.)  He entered the United States without inspection around 2010 and has resided in the United States continuously for approximately sixteen years.  (*Id.* ¶ 26.)  On January 9, 2024, Petitioner and his wife filed Form I-589 Applications for Asylum and for Withholding of Removal with United States Citizenship and Immigration Services ("USCIS").  (Dkt. No. 11 (SEALED) ¶ 3; Dkt. No. 11-1 (SEALED).)  They have three children, including two United States citizen children, ages three and seven, and a fifteen-year-old child who is not a United States citizen.  (Dkt. No. 1, Pet. ¶ 27.)

In connection with his pending asylum application, USCIS required Petitioner to appear for biometrics and fingerprinting at an Application Support Center in West Palm Beach, Florida, on May 29, 2024.  (*Id.* ¶ 28.)  Petitioner appeared as directed, completed the biometrics process, and received a USCIS biometrics processing stamp confirming completion of the appointment. (Dkt. No. 1-1; Dkt. No. 11, ¶ 6 (SEALED).)  USCIS subsequently approved Petitioner's application for employment authorization and issued him an Employment Authorization Document valid from December 13, 2024 through December 12, 2029.  (Dkt. No. 1, Pet. ¶ 29; Dkt. No. 1-3; Dkt. No. 11, ¶ 7 (SEALED).)  Petitioner states that he complied with all requirements of the government, openly resided in the community, worked pursuant to a DHS-issued Employment Authorization Document, and has no criminal record.  (Dkt. No.  1, Pet.  ¶ 30.)

Around June 27, 2026, while traveling with his family to a private property near Stuart, Florida, for off-road recreational activities, Petitioner was stopped by a park ranger because of a broken trailer license plate.  (*Id.* ¶ 31.)  Petitioner was arrested and taken into immigration custody.  (*Id.*)  Initially, he was detained at the Krome Processing Center in Florida.  (*Id.* ¶ 32.)  Counsel filed a motion requesting a custody redetermination on July 2, 2026, but before that request was adjudicated, Petitioner was transferred to the Otay

Mesa Detention Center in San Diego, California, where he remains detained. (*Id.*) On July 14, 2026, DHS initiated removal proceedings by filing a Notice to Appear with the Immigration Court. (Dkt. No. 11, ¶ 9 (SEALED).)

According to the petition, DHS did not provide him with notice that his liberty would be revoked or provide any opportunity to challenge the decision before a neutral decisionmaker. (Dkt. No. 1, Pet. ¶ 33.) He was also not provided an individualized custody determination before arresting and detaining him. (*Id*.) The petition further claims that Respondents have not identified any changed circumstances or individualized basis to detain Petitioner after sixteen years of residence in the United States after he submitted biometrics, underwent security vetting, and received employment authorization. (*Id*. ¶ 34.) Petitioner also asserts he has no criminal record and Respondents have not shown he poses a danger to the community or is a flight risk. (*Id*.)

## Legal Standard

Under 28 U.S.C. § 2241, federal courts have jurisdiction to review challenges to the legality of immigration detention and may grant a writ of habeas corpus to a person who "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001). A petitioner bears the burden of proving "that he is being held contrary to law" and "must satisfy his burden of proof by a preponderance of the evidence." *Sepulveda Ayala v. Bondi*, 794 F. Supp. 3d 901, 911 (W.D. Wash. 2025) (quoting *Aditya W. H. v. Trump*, 782 F. Supp. 3d 691, 703 (D. Minn. 2025)).

## Discussion

Petitioner asserts two claims. First, Petitioner contends that Respondents violated the Due Process Clause of the Fifth Amendment by detaining him without constitutionally adequate process after years of permitting him to remain at liberty while administering his pending asylum application. (Dkt. No. 1, Pet. ¶¶ 51-54.) Second, Petitioner contends that Respondents violated the Administrative Procedure Act ("APA") by unlawfully invoking the detention authority of 8 U.S.C. § 1225(b) and by acting in an arbitrary and capricious

manner. (*Id.* ¶¶ 55-62.) Respondents maintain that Petitioner is subject to mandatory detention under 8 U.S.C. § 1225(b)(2), but do not oppose an order directing a bond hearing pursuant to 8 U.S.C. § 1226(a). (Dkt. No. 4 at 1-2.[1])

## A.    Fifth Amendment Due Process

Petitioner argues that Respondents violated the Fifth Amendment by arresting and detaining him without notice or an opportunity to be heard after he had lived openly in the United States for years, filed an application for asylum, complied with DHS's requirements, submitted biometrics, and obtained employment authorization. (Dkt. No. 1, Pet. ¶¶ 33-34, 53-54.)

### 1.    Protected Liberty Interest

The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause applies to all "persons" within the United States, including noncitizens, "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. Although Congress possesses broad authority over immigration, that authority "is subject to important constitutional limitations." *Id.* at 695. Among those protections, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" safeguarded by the Due Process Clause. *Id.* at 690.

Several district courts in California addressing similar circumstances have concluded that the Government's affirmative decision not to detain a noncitizen while knowingly administering the individual's immigration case can create a protected liberty interest in continued freedom. *See Kharitonova v. Albarran*, No. 3:26-cv-01362-JSC, 2026 WL 531441, at *2 (N.D. Cal. Feb. 25, 2026); *Kalkan v. Chestnut*, No. 1:26-cv-02028-DAD-EFB, 2026 WL 788112, at *1 (E.D. Cal. Mar. 20, 2026); *Villanueva-Montanez v.*

---

[1] Page numbers reflect CM/ECF pagination.

*Lyons*, No. 2:26-cv-00954-DAD-CKD, 2026 WL 797930, at *1 (E.D. Cal. Mar. 23, 2026); *E.E.O.H. v. Noem*, No. 1:26-cv-01266-JLT-SAB-HC, 2026 WL 850363, at *4-5 (E.D. Cal. Mar. 26, 2026), *report and recommendation adopted*, 2026 WL 967670 (E.D. Cal. Apr. 9, 2026).

In *Kharitonova*, the court rejected the Government's contention that no liberty interest could arise because the petitioner had never previously been detained and released. 2026 WL 531441, at *2. The court reasoned that although the Government "did not detain and then release her, it made a decision not to detain her in the first place," and she therefore possessed "the same liberty interest in her continued freedom as an individual initially detained." *Id.* The court emphasized that the Government had processed her asylum application, collected her biometrics, referred her case to Executive Office for Immigration Review ("EOIR"), and directed her to appear for immigration proceedings over a period of years. *Id.*

The court in *E.E.O.H.* found that reasoning persuasive and applied it to a petitioner who, like Petitioner here, entered without inspection, later filed an asylum application, completed fingerprinting and background checks, obtained an employment authorization document, and was detained for the first time years later. 2026 WL 850363, at *4-5. Relying on *Kharitonova*, the court held that the Government's decision not to detain the petitioner while processing his asylum application and granting work authorization created a protected liberty interest in his continued freedom. *Id.*

The Court finds the reasoning of *Kharitonova* and *E.E.O.H.* persuasive. Petitioner entered the United States without inspection but thereafter lived openly in this country for approximately sixteen years. (Dkt. No. 1, Pet. ¶ 26.) During that period, the Government accepted and processed his asylum application, required him to submit fingerprints and biometric information, conducted background and security checks, and issued employment authorization valid through 2029. (*Id*. ¶¶ 27-30.) Thus, with full knowledge of Petitioner's identity and immigration circumstances, the Government repeatedly exercised authority

26-cv-3965-GPC-VET

over his case while permitting him to remain at liberty as his asylum application remained pending.

Viewed as a whole, the Government's sustained course of conduct confirms that Petitioner's liberty interest was substantial and the Court now considers what process is due.

**2.      Constitutionally Required Process**

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted).  In determining what process is due, courts balance: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.  Each factor favors Petitioner.

First, Petitioner's private interest is substantial.  "Freedom from imprisonment— from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  Before his detention, Petitioner had lived at liberty in the United States for approximately sixteen years. (Dkt. No. 1, Pet. ¶ 26.)  During that time, he filed an asylum application, complied with USCIS's fingerprinting, biometric, and background-check requirements, obtained employment authorization valid through 2029, worked to support his family, and established significant family and community ties.  (*Id.* ¶¶ 27-30.)  As the Supreme Court recognized in *Morrissey*, even conditional liberty "includes many of the core values of unqualified liberty," permitting an individual to work, remain with family and friends, and "form the other enduring attachments of normal life."  408 U.S. 471, 482 (1972).  Petitioner's detention abruptly deprived him of those interests after years during which the Government knowingly permitted him to remain at liberty while processing his

immigration applications. The private interest is particularly weighty because Petitioner's detention interrupted a longstanding status quo that the Government itself had affirmatively maintained through years of processing Petitioner's affirmative asylum application and related benefits. This factor therefore weighs heavily in Petitioner's favor.

Second, the procedures employed created a substantial risk of erroneous deprivation. The second *Mathews* factor considers both "the risk of an erroneous deprivation" under the procedures employed and "the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. Where the Government detains a noncitizen after years of government-authorized liberty without first providing notice or an opportunity to be heard before a neutral decisionmaker, courts have consistently concluded that the risk of erroneous deprivation is high and that a pre-deprivation hearing would significantly reduce that risk. *See Kharitonova*, 2026 WL 531441, at *3; *E.E.O.H.,* 2026 WL 850363, at *5; *Kalkan,* 2026 WL 788112, at *2. As the Court in the Eastern District of California recently explained, "[t]he risk of erroneous deprivation from seizing a long-present, work-authorized asylum applicant with no criminal history, without any prior opportunity to be heard, is substantial, and the value of a pre-deprivation hearing in reducing that risk is correspondingly high." *Gagik T. v. Chestnut*, No. 1:26-cv-04337-MWJS, 2026 WL 1837413, at *4 (E.D. Cal. June 25, 2026).

That reasoning applies with equal force here. Respondents detained Petitioner without first providing notice of the proposed detention, disclosing the basis for concluding that detention had become necessary, or affording him an opportunity to contest that determination before a neutral decisionmaker. (Dkt. No. 1, Pet. ¶ 33.) Respondents identify no evidence that, before taking Petitioner into custody, they made an individualized determination that detention was warranted, including an assessment of whether Petitioner posed a danger to the community or a risk of flight. (*See* Dkt. No. 4.) Instead, after accepting Petitioner's asylum application for processing, directing him to submit biometric information and fingerprints, conducting background and security checks, issuing employment authorization valid through December 12, 2029, and

26-cv-3965-GPC-VET

permitting him to remain at liberty while his application remained pending, Respondents detained Petitioner without first making an individualized determination that detention was necessary.  (Dkt. No. 1, Pet. ¶¶ 27-34.)  Under these circumstances, a pre-deprivation hearing would have substantially reduced the risk of erroneous detention by permitting a neutral decisionmaker to determine whether any individualized factual basis justified depriving Petitioner of the liberty the Government had long permitted him to retain.  *See Mathews*, 424 U.S. at 335.

Third, the Government's interest does not outweigh the need for additional procedural safeguards.  Although the Government has legitimate interests in enforcing the immigration laws, protecting the public, and ensuring that noncitizens appear for immigration proceedings, those interests do not justify detaining Petitioner without first providing notice and constitutionally adequate pre-deprivation process.  Several courts considering whether due process requires a pre-deprivation hearing before immigration detention have concluded that the Government's interest in dispensing with those procedures is slight.  In *J.E.H.G. v. Chesnut*, No. 1:25-cv-01673-JLT-SKO, 2025 WL 3523108, at *12 (E.D. Cal. Dec. 9, 2025), the court held that "the government's interest in detaining Petitioner without proper process is slight."  Likewise, in *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1040 (N.D. Cal. 2025), the court concluded that there was "no countervailing government interest" in providing a hearing only after detention rather than beforehand.  Similarly, in *Alvarenga Matute v. Wofford*, 807 F. Supp. 3d 1120, 1135 (E.D. Cal. 2025), the court concluded that the Government's interest in dispensing with a pre-deprivation hearing was low because the cost of a custody hearing was "minimal."  Finally, in *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019), the court explained that although the Government retains authority to take a noncitizen into custody, "its interest in doing so without a hearing is low."

Again, Respondents identify no circumstance requiring Petitioner's immediate detention before a neutral decisionmaker could determine whether detention was warranted, including whether he posed a danger to the community or a risk of flight.  (*See*

Dkt. No. 4.)  To the contrary, Respondents detained Petitioner after years of permitting him to remain at liberty while affirmatively administering his pending asylum application, requiring him to submit biometrics, conducting security vetting, and issuing him an Employment Authorization Document.   (Dkt. No. 1, Pet. ¶¶ 27-34.)   Under these circumstances, providing constitutionally adequate pre-deprivation process would have imposed little additional burden while substantially reducing the risk of an erroneous deprivation of liberty.

Balancing the *Mathews* factors, the Court concludes that due process required Respondents to provide Petitioner with notice and an opportunity to be heard before depriving him of his liberty.  Petitioner had a substantial liberty interest in remaining free from physical detention after years of government-authorized liberty; the procedures employed created a significant risk of erroneous deprivation; and Respondents have identified no governmental interest sufficient to justify dispensing with pre-deprivation process.  For those reasons, the Court concludes that Respondents violated Petitioner's procedural due process rights under the Fifth Amendment by detaining him without constitutionally adequate pre-deprivation process.

Respondents' offer to provide a post-deprivation bond hearing does not alter that conclusion.  As the Supreme Court has explained, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).  Although a prompt post-deprivation remedy may satisfy due process where "the necessity of quick action by the State" or "the impracticality of providing any predeprivation process" renders prior process infeasible, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981)), Respondents identify no such circumstances here.  Because pre-deprivation process was both feasible and constitutionally required, Respondents' offer of a post-deprivation bond hearing does not cure the constitutional violation.  *See Zinermon*, 494

26-cv-3965-GPC-VET

U.S. at 127-30, 136-39. Accordingly, the Court GRANTS the petition for writ of habeas corpus and orders Petitioner's immediate release from DHS custody. [2]

## Conclusion

Accordingly, IT IS HEREBY ORDERED that

1. Petitioner's Petition for Writ of Habeas Corpus is **GRANTED**.

2. Respondents **SHALL IMMEDIATELY RELEASE** Petitioner from DHS custody and restore him to the status quo ante, including by returning his personal property and documents upon release.

3. Respondents **SHALL NOT** re-arrest or re-detain Petitioner absent compliance with constitutional protections, which include, at a minimum, pre-deprivation notice of at least seven days before a pre-deprivation hearing at which the government will bear the burden of demonstrating by clear and convincing evidence that Petitioner is likely to flee or pose a danger to the community if not detained.

4. The hearing set for August 7, 2026 is **<u>VACATED.</u>**

5. The Clerk of Court SHALL enter judgment in Petitioner's favor and close this case.[3]

IT IS SO ORDERED.

Dated: August 3, 2026

Hon. Gonzalo P. Curiel
United States District Judge

---

[2] Because the Court concludes that Petitioner's detention violated the Due Process Clause of the Fifth Amendment and grants relief on that basis, the Court need not and does not reach Petitioner's remaining APA claim. *See Jones v. Ryan*, 52 F.4th 1104, 1147 (9th Cir. 2022) ("Because we have determined that Jones is entitled to relief . . . we need not and do not reach" the remaining issues).

[3] In his prayer for relief, Petitioner requests attorney's fees and costs pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. (Dkt. No. 1 at 14.) Under the EAJA, a prevailing party seeking fees must file an application "within thirty days of final judgment" demonstrating eligibility for an award, the amount sought, and that the position of the United States was not substantially justified. 28 U.S.C. § 2412(d)(1)(B). Any request for attorney's fees and costs under the EAJA shall be made in accordance with that statute.

26-cv-3965-GPC-VET

26-cv-3965-GPC-VET